CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

6/7/2023

LAURA A. AUSTIN, CLERK
BY:   s/ CARMEN AMOS
      DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
**Lynchburg Division**

**MARY LYNN SHUMATE,**

     **Plaintiff,**

**v.**                                      **Case No.** **6:23CV00032**

**CITY OF LYNCHBURG,**

**GREGORY WORMSER, FIRE CHIEF,**
*In his Official Capacity,*

**WYNTER BENDA, CITY MANAGER**
*In his Official Capacity,*

     **Defendants.**

## COMPLAINT

COMES NOW Plaintiff Mary Lynn Shumate, by counsel, and files this Complaint against Defendant City of Lynchburg, ("the City"), Defendant Gregory Wormser, Fire Chief, *in his official capacity*, and Defendant Wynter Benda, City Manager, *in his official capacity*, and states the following in support thereof.

### I.    JURISDICTION

1.    This Court has jurisdiction over this matter as it arises under federal and Virginia law and therefore this Court possesses federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2.    Plaintiff's state law claims that are so related to her federal claims that they form part of the same case or controversy.  This Court possesses supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3.    Plaintiff is domiciled in Campbell County, Virginia.

4.      The City is an incorporated and chartered city under the laws of the Commonwealth of Virginia.

5.      The City established and manages the Lynchburg Fire Department. Va. Code §§ 27-6.02(A), -6.1; Lynchburg City Charter Section 39; Code of Ordinances City of Lynchburg, Virginia, Ch. 19, Art. II.

6.      The Lynchburg Fire Department is a "governmental agency" as that term is used by the Fraud and Abuse Whistle Blower Protection Act, Va. Code § 2.2-3009 *et seq*.

7.      **Defendant** Gregory Wormser, Fire Chief, *in his official capacity*, and Defendant Wynter Benda, City Manager, *in his official capacity*, are the "employers" as that term is used by the Fraud and Abuse Whistle Blower Protection Act, Va. Code § 2.2-3009 *et seq*.

8.      The acts and omissions complained herein were committed by Defendants within the Western District of Virginia.  Venue is proper in this Court, as the acts and/or omissions substantially occurred within the Court's geographic area. *See* 28 U.S.C. § 1391(b)(2).

9.      Plaintiff's administrative complaint was timely investigated by the Equal Employment Opportunity Commission.  Plaintiff received her Notice of Right to File a Civil Action on March 10, 2023, attached as **EXHIBIT A**. Plaintiff files this lawsuit within 90 days of receipt of that letter.

## II.     FACTS

10.     Plaintiff, a female, was employed with the City as a Master Firefighter until her unlawful demotion to Firefighter/ALS on or about January 7, 2022.

11.     Plaintiff was first hired as a firefighter with the City in August of 2007 before climbing the ranks to Master Firefighter.

12.     In her 15 years with the department, Plaintiff had never been the subject of a disciplinary action, until her retaliatory demotion which is the subject of this case.

13.     At the start of her career with the Lynchburg Fire Department, Plaintiff was assigned, at her request to Lynchburg's busiest station, Station 6.

14.     However, Plaintiff was transferred to Station 1 in order to obtain training on the department's technical rescue equipment.

***Plaintiff experiences discriminatory and disparate treatment from her superiors***

15.     While she was at Station 1, Captain Matt Millner instructed Plaintiff that per instructions from DC Lipscomb, she was not permitted to ask questions of DC Lipscomb when he discussed operations minutes. None of Plaintiff's male workers were instructed to keep quiet, and they continued to ask questions freely.

16.     Plaintiff complained about this disparate treatment to her supervisors.  Defendants transferred Plaintiff back to Station 6.

17.     When she returned to Station 6, she worked under Captain David Jackson, who made it apparent that he did not believe women should in the fire service.

18.     Captain Jackson often uttered statements that supported this line of thought.  As an example, he was heard saying, "there are no females in this department that can pull me out of a burning building."

19.     At that time, Captain Jackson required Plaintiff to submit a doctor's note each time she took a sick day. None of Plaintiff's male coworkers were required to submit doctor's notes to prove that they were not abusing the sick leave policy. In one case, a male coworker was out for

more sick days than Plaintiff yet this male employee was not required to submit a note under Captain Jackson's leadership. This is an example of disparate treatment on the basis of gender that resulted in disparate day-to-day practices at the workplace.

20.     After Captain Jackson denied a training request made by Plaintiff, she asked him why.  Captain Jackson stated that, "[i]t is up to me to decide what training would be good for you or not, and I do not see where that training would be beneficial for you." Male employees were routinely approved for this training.  The training would have been an asset to Plaintiff in her career track to progress within the chain of command and become a master firefighter. Denying training fostered negative ripple effects throughout Plaintiff's career.

21.     During this time, Plaintiff reported Captain Jackson's hostility toward women, generally, and to herself, specifically, to Lynchburg's Human Resources Department employee Nichole Campbell.  The City used a policy and established practice whereby supervisors delegated concurrent authority to field and hear complaints at the workplace to Human Resources.

22.     Upon information and belief, Captain Jackson was not reprimanded, but Plaintiff was transferred to Station 4, and then to Station 8 in late 2017.

23.     Plaintiff was promoted to Master Firefighter in July of 2019, while working at Station 8.

24.     In late 2019 or early 2020, the fire department purchased ballistic vests for the firefighters and medics and instituted a policy stating the particular circumstances in which the vests were to be worn. The vests were one-size fits all.  When Plaintiff donned the vest, Plaintiff did not have full use of her arms as the vest restricted her movement

significantly more than a man's body might. When Plaintiff bent over at her hips, the vest covered her face. As a consequence, Plaintiff informed DC Wright that she could not sign the policy because the vest did not fit and restricted mobility significantly.  From her training and experience, Plaintiff recognized that the vest was more of a hazard for her than an asset that added protection.

25.     At the request of DC Wright, fire department employee Randy Campbell, came to the station to address the problem, and told Plaintiff that she should just wear the vest and "get used to being uncomfortable."

26.     In July 2020, Captain Candace Brown, the EMS supervisor, provided Plaintiff with a "letter of improvement," falsely claiming that Plaintiff was not providing proper care to patients, among other things.  Captain Brown did not have the authority to reprimand Plaintiff without addressing the matter through Plaintiff's supervisor, Captain Eddie Campbell. When Captain Campbell confronted Captain Brown with her violation of the chain of command and failure to comply with City policies, Captain Brown did not follow through with the threats.

27.     A year later, in June 2021, Captain Brown attempted a second discipline of Plaintiff, again without involving Captain Campbell, but again, Captain Brown failed to follow through on the discipline when required to follow the chain of command and city policies.

28.     On June 29, 2021, Plaintiff complained to Captain Campbell and Battalion Chief ("BC") Mike Reeves that BC Reeves and Captain Brown were creating a "hostile work environment", based in part on her gender.

29.     Specifically, Plaintiff alleged that she was treated less favorably than her male counterparts when she called in sick. She was required to produce a doctor's note when she returned to work (while the men were not asked to do so), and she was penalized with less favorable shift assignments by BC Reeves, who was in charge of scheduling.

30.     Plaintiff also noted that whenever BC Reeves needed someone to fill a lower-level position on the medic unit, he assigned Plaintiff to that post, while he had a less senior male employee fill a higher status position: "riding the seat."

31.     Finally, BC Reeves habitually denied Plaintiff's shift trade requests for reasons which were not applied to her male counterparts.

32.     BC Reeves communicated to Deputy Chief ("DC") Jonathan Wright that Plaintiff had complained of a hostile work environment.

33.     DC Wright tasked BC Reeves with investigating Plaintiff's complaints of a hostile work environment, despite Plaintiff making accusations, in part, against BC Reeves.

34.     On July 20, 2021, BC Reeves appeared at Station 8 to question Plaintiff as a part of his investigation.

35.     Sometime later at the insistence of the City's HR Department, DC Wright tasked an outside investigator, Randy Trent, with investigating Plaintiff's complaints.

36.     At no time were BC Reeves, Captain Brown or Master Firefighter Kilgore placed on administrative leave, pending the outcome of the investigation.

37.     On July 27, Plaintiff noticed that her leave request for August 1, submitted on July 20, had been denied by BC Reeves, but that Reeves had approved another employee for leave on that day who submitted a request on July 27.

38.     On August 1, DC Wright emailed Plaintiff, requiring her to put her complaint in writing and submit it to him by the following day.

39.     On August 4, 2021, Plaintiff made a formal complaint of sex/gender discrimination to Randy Trent and the City's Director of Human Resources, Michelle Jackson.

40.     On or about August 25, 2021, DC Lipscomb hand-delivered a letter to Plaintiff at her fire station.

41.     The letter, dated August 19, 2021, acknowledged receipt of Plaintiff's complaint of gender discrimination against BC Reeves, Captain Brown, and Master Firefighter Kilgore complaining of gender discrimination and stated that Randy Trent would be doing the investigation.  This letter included a direct gag order.

42.     Plaintiff was interviewed by Randy Trent on September 6, 2021, and had a follow-up interview with Trent on October 21.

43.     In the follow-up interview, Trent asked Plaintiff if she had reported the August 1 vacation day denial to BC Reeves.  Plaintiff explained that she had not because BC Reeves always reacted angrily when anyone challenged his schedule, and he would retaliate against a "complainer" for several shifts thereafter, by putting that person on less desirable assignments. Plaintiff herself had been the recipient of this retaliatory behavior on multiple occasions.

44.     Upon information and belief, Randy Trent submitted the final report of his investigation to DC Lipscomb during the week ending October 29, 2021.

45.     On November 2, Plaintiff contacted Trent to ask about the status of her complaint. Trent told Plaintiff that he had submitted his final report the previous week.

46.     On November 9, Plaintiff emailed DC Wright and DC Lipscomb asking about the status of the investigation into her complaint.

47.     Finally, on November 16, 2021, Plaintiff received a letter, dated November 10, 2021, from DC Lipscomb stating that her complaint was "unfounded."

***Plaintiff complains of discrimination, Defendants opens investigation of <u>Plaintiff</u>—for discriminatory behavior, and enlists a personal friend of Deputy Chief Wright to conduct an investigation***

48. Once Plaintiff stated her complaint against BC Reeves, Captain Brown, and MFF Kilgore, the City initiated an investigation of Plaintiff.

49. Upon information and belief, the investigation was initiated when an employee overheard a conversation between Plaintiff and one of her subordinates, and repeated it, out of context and with embellishment, to Battalion Chief Danny Williams. This complaint was provided to BC Williams so that he would then forward the matter to to DC Lipscomb.

50. On October 6, 2021, Danny Williams provided DC Lipscomb a memorandum reporting an allegation by an unidentified employee, believed to be the subject of Plaintiff's discrimination complaint.

51. According to the Memo, the unidentified employee reported that s/he "was informed" about a conversation that Plaintiff had with a subordinate employee in which Plaintiff inquired if the employee's homosexuality bothered the subordinate employee, was offensive to the subordinate employee, or, if the subordinate employee felt uncomfortable, then the subordinate employee needed to inform Plaintiff. Neither the subordinate employee nor the employee whose sexual orientation was allegedly mentioned in the confidential conversation made a complaint about Plaintiff.

52. The City tasked former fire department employee, Randy Campbell (who had previously told Plaintiff that she needed to "get used to being uncomfortable" wearing a one-size fits all man's ballistics vest) with investigating the allegations in the Memo.

53. Upon information and belief Randy Campbell is a personal friend of DC Wright and intentionally performed a sham investigation.

54.     Five of the seven employees reported that their knowledge of the situation came from another unidentified employee who said that he or she had heard from a third unidentified employee that Plaintiff had discussed the sexual orientation of another unidentified employee with a subordinate employee.

55.     One employee appears to have been the employee with whom Plaintiff spoke in confidence, who testified that Plaintiff brought up the sexual orientation of the other employee to him because Plaintiff was aware of an incident in his past which might have caused him to be uncomfortable with the other employee.

56.     On October 24, 2021, BC Reeves left a letter for Plaintiff at her fire station explaining that she was being placed under investigation for possible violations of Lynchburg's Code of Conduct and Harassment Policy. The letter accused Plaintiff of having a conversation with a subordinate employee in the previous three weeks in which she asked if the subordinate employee was bothered or offended by another employee's homosexual orientation.

57.     The letter notified Plaintiff that she would be interviewed by Randy Campbell on the afternoon of October 27. The letter did not identify either employee or provide any information. The letter did not include any of the testimony of the witnesses interviewed by Campbell. This accusation did not meet the requirements of the Firefighters and Emergency Medical Technicians Procedural Guarantee Act, which states that "[n]o firefighter . . . shall be subjected to interrogation without first receiving written notice of sufficient detail of the investigation in order to reasonably apprise the firefighter . . . of the nature of the investigation." Va. Code § 9.1-301(2).

58.     On the morning of October 27, 2021, BC Reeves called Captain Campbell and told him to report to Station 7 immediately, where he would be interviewed.

59. Surprised at the call, Captain Campbell drove himself and Plaintiff, whose presence he assumed was also required, to Station 7.

60. While Captain Campbell and Plaintiff continued to wait at Station 7, Randy Campbell entered the room and told Plaintiff casually that it was his understanding that "Johnny boy" (referencing DC Wright) provided Plaintiff with Mr. Campbell's contact information, and Mr. Campbell looked forward to interviewing her later that afternoon.

61. In the afternoon of October 27, 2021, Randy Campbell interviewed Plaintiff. Captain Campbell was present as neutral observer in accordance with Va. Code § 9.1-301(5).

62. During the interview, Randy Campbell stated that he would be recording the interview.  Plaintiff responded that she would like a copy of the recording in accordance with Va. Code § 9.1-301(7).

63. During the interview Randy Campbell told Plaintiff that seven individuals had been interviewed and provided information on the accusations against Plaintiff, including one Captain Warren Jamerson.

64. Upon information and belief, as of October 27, 2021, Captain Jamerson had not been interviewed by Randy Campbell.

65. During Plaintiff's interview, Randy Campbell questioned Captain Campbell, in violation of Va. Code § 9.1-301(5).

66. Because Plaintiff's interrogation violated multiple provisions of the Firefighters and Emergency Medical Technicians Procedural Guarantee Act, it was not admissible against her. Va. Code § 9.1-302.

67.     At the conclusion of the interview, Plaintiff repeated her request for a copy of the recording in accordance with Va. Code § 9.1-301(7).

68.     On November 1, 2022, Chief Wormser emailed Plaintiff a letter stating that she was being placed on administrative leave with pay pending the outcome of the investigation against her.

69.     This letter violated City employment policies which require the Department Director to have "[a] face-to-face meeting [with] the employee [in which] [the] [e]mployee[] shall be given an opportunity to respond either verbally or in writing to show cause why the action should not be taken." City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(3).

70.     On November 8, Plaintiff called Randy Campbell because she had questions about the accusations against her. Randy Campbell told her contact DC Wright to set up a meeting with him and Campbell. The same day, Plaintiff emailed DC Wright as Randy Campbell had directed. DC Wright did not respond to Plaintiff's email.

71.     On November 9, Plaintiff called DC Wright and asked again for a copy of the recording of her October 27 interview. DC Wright told Plaintiff that "Tammy" was working on the transcript that day, and Plaintiff could have a copy when the transcription was completed.

72.     Randy Campbell arranged a meeting between himself with Plaintiff for November 19, 2022. Plaintiff's neutral observer, Brandon Barney, was present by phone.

***Having determined her complaint of discrimination to be "unfounded," the City determines to demote Plaintiff for alleged sexual harassment in violation of City employment policies***

73.     By letter dated January 7, 2022, Chief Wormser demoted Plaintiff from Master Firefighter to firefighter/ALS ("the January Letter").

74. Notification of her demotion by letter/email violated City of Lynchburg Employment Policies and Procedures which require that a City employee, being demoted for cause, must have a "face-to-face meeting" with the Department Director or designee [where] the employee shall receive notice of the intent to demote, including the reasons for the proposed demotion, in advance of the proposed demotion. . . The employee shall be given the opportunity to respond either verbally or in writing to explain why the action should not be taken. . . The employee shall receive a letter of final determination at least 24 hours prior to the effective date of demotion." City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(4).

75. According to the January Letter, the City found that Plaintiff, "engaged in an inappropriate discussion with employees under [her] command about the sexual orientation of another employee." According to the City, the employees involved in the conversation with Plaintiff "stated that they felt uncomfortable about the conversation because it was not appropriate."

76. Based upon these findings, the City concluded that Plaintiff had violated policies against "Workplace Violence" by "verbally harass[ing] [City] employees," and "sexually harassing an employee."

77. The City also concluded that Plaintiff had committed the "More Serious Infraction" of sexual harassment (see City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(8)(q)) which the City defines as "any unwelcome sexual advance, request for sexual favors and/or other verbal or physical conduct of a sexual nature when: (1) [s]ubmission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) [s]ubmission to or

rejection of such conduct upon an individual is used as a basis for employment decisions affecting such individual; (3) such conduct has a purpose or effect of substantially interfering with an individual's work performance or creating an intimidating hostile or offensive working environment." See City of Lynchburg Employment Policies and Procedures, Chapter 7, Section X, Subsection B.

78.     The allegation, even if true, that Plaintiff discussed the sexual orientation of one employee with other subordinate employees cannot support a finding that Plaintiff made an "unwelcome sexual advance, request for sexual favors, or [made] other verbal or physical conduct of a sexual nature" towards her subordinate employees.

79.     The accusations against Plaintiff were false and/or grossly overblown in order to provide pretext for her demotion.

80.     Plaintiff's demotion did not comply with the City's policies, which require certain factual findings prior to initiating a disciplinary action against an employee.

81.     Specifically, "written disciplinary actions must . . . contain the following information: . . . What the employee did; clearly stating the specific conduct deemed unacceptable, describing the conduct in complete and explicit terms using plain language[]" including "dates, names, places, events, witnesses, etc." City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(2)(a).

82.     Written disciplinary actions must explain how the behavior violated an expectation or rule and include references to previous instances of unacceptable behavior. City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(2)(b).

83.     Written disciplinary actions must "cite the adverse effect of the employee's conduct on departmental or City operations [including] real or potential . . . harm to citizens or co-workers

or real or potential liabilities." City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(2)(c).

84.     Written disciplinary actions must "provide specific suggestions and/or directives for the employee to correct the behavior." City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(2)(d). The January letter included no such suggestions.

85.     Written disciplinary actions must explain "the employee's rights . . . concerning the action." Specifically, "the employee has a right to receive a copy of any documents that could lead to an adverse action prior to it being finalized." City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(2)(e). The January Letter made no mention of Plaintiff's rights to the documents the City relied upon to reach its demotion decision.

86.     Finally, the January letter did not inform Plaintiff that her salary would be reduced. This was a violation of Lynchburg City Policies that "written disciplinary actions must state the specific action being taken." City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(2).

***Plaintiff asserts her rights under City employment policies and challenges the planned demotion. The City finalizes Plaintiff's demotion and downgrades her salary in violation of City Policy***

87.     In receipt of the January letter, Plaintiff emailed Chief Wormser on January 12, 2022, requesting, in accordance with City Policy, "any documents that could lead to an adverse [employment] action prior to it being finalized." See City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(2)(e).

88.     She also requested again any recording or transcript made of her interview with Randy Campbell on October 27, 2021, in accordance with Va. Code § 9.1-301(7).

89.     On January 20, 2022, Chief Wormser notified Plaintiff that she could collect requested documents and a thumb drive. Upon information and belief, the set of documents provided to Plaintiff did not include all the documents upon which the City based its demotion decision.

90.     After meeting with Chief Wormer on January 25, 2022, Plaintiff continued to ask for documents to which she was entitled under the City policy, specifically the Memo, which was referenced in Randy Campbell's report of his investigation. See City of Lynchburg Employment Policies and Procedures, Chapter 7, Section VI, Subsection M(2)(e).

91.     Chief Wormer issued a letter on February 22, 2022, demoting her from Master Firefighter to Firefighter ALS, effective March 2, 2022, and made her ineligible for promotion for "until 2026," which was later revised to "until 2024".

92.     In March 2022, Plaintiff's threatened demotion took effect.

93.     Upon information and belief, Plaintiff is the first female Lynchburg firefighter to be demoted for disciplinary reasons.

94.     Plaintiff's corresponding salary after demotion was formulated based upon an hourly rate of $15.1725/hour, 15.4% lower than her hourly rate as a Master Firefighter, $17.85/hour.

95.     This salary decrease violated City employment policies which state that, "[a]n employee demoted for cause shall normally have his or her pay reduced by 10% or moved to the maximum of the new range, whichever is lower." City of Lynchburg Employment Policies and Procedures, Chapter 3, Section IV, Subsection F. At the time of Plaintiff's demotion, the upper

salary range for Firefighter/ALS was $72,966.40, higher than her salary based upon her Master Firefighter hourly rate. Thus, Plaintiff's salary upon her demotion could not be more than 10% lower than her salary as a Master Firefighter. Plaintiff's 15% reduction violated City policy.

### *Plaintiff returns to work and is reprimanded for asking about the status of her damaged helmet - - which the City never had repaired - - willfully leaving Plaintiff at risk of injury*

96.     With her demotion, Plaintiff was also transferred to a less desirable position at Station 4, under the command of BC Sean Regan, who Plaintiff strongly believed had worked with Captain Brown in the past to initiate two bogus disciplines against Plaintiff without the cooperation of her Captain.

97.     In early 2021, Plaintiff's helmet was damaged, and the fire department was supposed to send the helmet to be tested and possibly repaired.  For example, the helmet's face piece / mask leaked when using the Self-Contained Breathing Apparatus. When Plaintiff was placed on administrative leave in October 2021, the helmet had still not been tested or repaired, creating a possible safety risk for Plaintiff when she was put in a situation in which she would depend upon the helmet's protection. Plaintiff has many communications and followed-up with multiple employees regarding the repair of her helmet.

98.     When she returned to work in March 2022, the helmet had still not been repaired, and she advised her new Captain, Ryan Lee, of the situation. Upon information and belief, Captain Lee asked Logistics Officer Captain Anthony Todd for an update on the status of the helmet.

99.     Two months later, on May 8, 2022, having had no update about repairs to her helmet, Plaintiff sent an email to Captain Lee and Captain Davis requesting to meet

and receive an update. When they met, Captain Davis insisted that he had been keeping Captain Lee and Plaintiff informed of the status of the helmet repair, though he had sent to email in two months.

100.    After another two months passed with no update on the helmet, Plaintiff emailed Captain Lee, copying BC Sean Regan, on June 24, 2022, asking for an update, and sent the email with the approval of Captain Lee.

101.    On June 27, and again on July 3, 2022, BC Regan came to Station 4 and informed Captain Lee that Plaintiff was not to include BC Regan on emails and that she was violating the chain of command, even though Captain Lee informed BC Regan that he had approved the email and that Plaintiff had stayed within her chain of command.

102.    Upon information and belief, the City took no action to test or repair Plaintiff's helmet, creating a risk to her safety.

### *Plaintiff contests her demotion, continues to suffer harassment, and is constructively discharged*

103.    On or about March 22, 2022, Plaintiff complained to Captain Lee, and HR Director Michelle Jackson about her demotion. Plaintiff complained the investigation into the false accusations against her was biased. She also stated that "[she] believe[d] that if [she] had been a male officer, [she] never would have been written up or demoted."

104.    By letter of March 25, 2022, Chief Wormser informed Plaintiff that the City would investigate her allegations, and she would be interviewed as a part of that investigation on April 4, 2022.

105.    After an investigation by attorney John Falcone, Michelle Jackson, Director of Human Resources informed Plaintiff on May 3, 2022, that her complaint had been "deemed unfounded."

106.    On May 16, 2022, Plaintiff was informed that she would be scheduled to ride Engine 2, rather than Engine 4.

107.    BC Reeves and/or BC Regan schedule all firefighters and EMS personnel under them. Plaintiff's original fire station had the minimum number of staff members for the station to be "fully operational." The City's typical practice is that if an individual is to be moved to a different station, it must occur with sufficient notice for that individual to report to the new fire station by 7:30AM.

108.    On or about May 17, 2022, BC Reeves reassigned Plaintiff to a different fire station with insufficient notice to report by 7:30AM.

109.    Put another way, by moving Plaintiff to the new station, the staffing level at her original station dropped below the minimum needed to operated the station.

110.    Further, it is common knowledge that Medic Unit 7 is an "undesirable" assignment. Indeed, a man with similar qualifications to Plaintiff had not been assigned to Medic Unit 7 in quite some time, despite the ability of BC Reeves to assign this man to Medic Unit 7.

111.    On or about May 28, 2022, Plaintiff's schedule, again, was created in a retaliatory manner in contravention of City and Fire Department policies and norms.

112.    On January 3, 2023, Plaintiff was forced to resign, having been constructively discharged "because [she] encountered numerous setbacks to [her] career that were out of [her] control." She noted that "[t]he environment has not changed and it will not seemingly change."

III.     <u>COUNT I: DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF</u>
<u>TITLE VII OF THE CIVIL RIGHTS ACT</u>
<u>*Against Defendant City of Lynchburg Only*</u>

113.     Plaintiff incorporates by reference the preceding paragraphs of the Complaint.

114.     Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

115.     Plaintiff identifies her gender as female.

116.     At all times material hereto, the City had an obligation to maintain a work environment that was not charged with sex discrimination and hostile to Plaintiff and other female employees.

117.     The City violated federal law by creating and permitting a work environment to exist that was discriminatory and hostile to Plaintiff and other female employees, and by wrongfully effectively discharging Plaintiff by not reappointing her.

118.     The above-referenced employees were acting in the course and scope of their employment with the City at the time of their actions; therefore, the City is liable for their actions under the doctrine of *respondeat superior*. Their actions against Plaintiff were committed during working hours and at their place of employment and/or were in conjunction with work-related responsibilities.

119.     As a direct and proximate result of the City's actions, Plaintiff has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

120.     Prior to her demotion and prior to her constructive discharge, Plaintiff was performing her work at a satisfactory level and meeting or exceeding the City's legitimate business expectations.

121.    The above-described acts by the City constitute sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

122.    Plaintiff is entitled to all reasonable costs, including attorneys' fees, associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

123.    The Lynchburg Fire Department is an instrumentality of the City of Lynchburg. Va. Code § 27-6.02(A), -6.1; Lynchburg City Charter Section 39; Code of Ordinances City of Lynchburg, Virginia, Ch. 19, Art. II.

124.    Pursuant to Va. Code § 15.2-1500.1, the City may not "discriminate in employment on the basis of . . . sex . . ."

125.    The City is an "employer" as that term is considered by Title VII.

126.    The City maintained a culture that discriminated against women and rewarded such behavior.

**IV.    COUNT II: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**
***Against Defendant City of Lynchburg Only***

127.    Plaintiff incorporates by reference the preceding paragraphs of the Complaint.

128.    The City discriminated against Plaintiff in violation of federal law when it retaliated against her and demoted her for complaining about gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.

129.    The City would not have retaliated against Plaintiff but for her protected activities under the law.

130.    The City violated its own policies repeatedly in order to take action against Plaintiff in retaliation for her complaints of gender discrimination.

131.     As a direct and proximate result of the City's actions, Plaintiff has suffered and will continue to suffer pecuniary loss, compensatory damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

132.     The above-described acts by Defendant constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

133.     Ms. Shumate is entitled to all reasonable costs, including attorneys' fees associated with this matter, plus interest, pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT III: RETALIATION PURSUANT TO THE FRAUD AND ABUSE WHISTLE BLOWER PROTECTION ACT, VA. CODE § 2.2-3009 *et seq.*
### *Against All Defendants*

134.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

135.     Throughout her employment, Plaintiff continuously reported "wrongdoing" to her employer.  This term means a violation, which is not of a merely technical or minimal nature, of a federal or state law or regulation, local ordinance, or a formally adopted code of conduct or ethics of a professional organization designed to protect the interests of the public or employee.

136.     Plaintiff engaged in multiple protected acts pursuant to the Fraud and Abuse Whistle Blower Protect Act.

137.     Plaintiff was retaliated against for engaging in such acts.  Such retaliation was willful and knowingly made by Defendants.

138.     At all times, Plaintiff reported issues within the chain of command with good faith.

139.     Defendants violated the Fraud and Abuse Whistle Blower Act and Plaintiff has suffered harm.

WHEREFORE, Plaintiff Mary Shumate demands judgment, jointly and severally, against Defendant City of Lynchburg and Defendant Gregory Wormser, Fire Chief, *in his official capacity*, and Defendant Wynter Benda, City Manager, *in his official capacity*, for injunctive and equitable relief, lost wages and benefits, backpay, frontpay, full reinstatement, equitable relief, economic damages reasonably foreseeable damages, compensatory damages, punitive damages, together with prejudgment interest, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY is demanded on all matters upon which a trial by jury may be demanded.

Respectfully Submitted,

MARY LYNN SHUMATE

_____
Thomas E. Strelka, Esq. (VSB # 75488)
L. Leigh Rhoads, Esq. (VSB # 73355)
Brittany M. Haddox, Esq. (VSB # 86416)
Monica L. Mroz, Esq. (VSB # 65766)
STRELKA EMPLOYMENT LAW
4227 Colonial Ave. SW
Roanoke, VA  24018
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
brittany@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff*